McBRIDE, Judge.
This is a suit brought by Valsin A. Guidroz against The Travelers Insurance Company, the liability insurer of the Ionian Club and its Krewe of Omardz, and National Surety Corporation, the liability insurer of the Municipal Auditorium, in which he claims of said defendants, in solido, the aggregate sum of $40,469, for personal injuries which he alleges he sustained as a result of a fall while attending the carnival ball of the Krewe of Omardz on the evening of February 12, 1955, in the Municipal Auditorium in New Orleans. From a judgment dismissing his demands, plaintiff has appealed.
The lower court, in deciding the case in favor of the defendants, handed down well-prepared and comprehensive reasons for judgment in which he stated his appreciation of the facts as he saw them. Finding them fully supported by the preponderance of the evidence, we are fully in accord with the factual findings and now quote the pertinent parts of the reasons given below and adopt the same as our own, viz.:
“ * * * The Travelers Insurance Company is the insurer of the Carnival organization which ball the plaintiff was attending, and the National Surety Company is the insurer of the Auditorium. The Travelers Insurance Company has placed *917 in the record its policy, and there is a stipulation of counsel that the National Surety Company is the insurer of the Auditorium in an amount in excess of the amount claimed in this suit; to wit: $40,469. The plaintiff is a resident of Thibodaux, Louisiana, of age at the present time of 71, and in company with friends, he attended the ball in question at the Auditorium on February 12, 1955, arriving there previous to the time of the tableau, which began sometime between 7:00 and 7:30 in the evening, while he, in addition to being invited to the ball, was also a member of the committee of committeemen of the ball and even being invited to participate as such; which committee is not made plain by his own testimony, but a committee. He testifies that he performed no functions, and reported to no one on this particular committee.
“During the course of the evening, he was seated in a call-out section under the balcony known as Section K, or so designated as Section K. The call-out seat of the Auditorium consists of platforms with six-inch risers from the floor, going back six rows. The plaintiff, previous to the time of the accident, was seated on Row C, which by his own testimony and by the record in the case is an 18-inch elevation from the floor level of the Auditorium. He was seated there talking to the ladies of his party previous to the accident, and had been talking to a gentleman who also testified in the case who accompanied him here from Thibodaux.
“ * * * During the tableau of the ball, the plaintiff sometime later, with the intention of going into the corridor to smoke, left his seat and proceeded on Row C towards the Canal Street or stage end of the platform. This end of the platform is generally guarded by chain, which chain is strung between iron stanchions or pipes from the rear of the platform to the first step of the platform. The chain is a removable chain, the same type normally used in harnesses of horses and which has a clip which can be manually operated by anyone, and the chain can be removed or the clip can be removed from the eye to which it is attached. It is well here to say that there are eyes in the stanchion to which each end of the chain is attached. On the night in question, at the time of accident, the record convinces the Court that the chain had been removed from the first three rows; that is, it was hanging down from the stanchions just above or at the end of Row C; in other words, there was no chain for the first three rows, A, B, and C. The record shows that these call-out seats are located under the balconies and that the lighting system of the Auditorium, which is controlled during a carnival ball by an electrician who is an employee of the Auditorium, consists of under-balcony ceiling lights described by one witness as pan lights, and under-balcony bracket lights. The evidence shows that these lights contain bulbs of 150 and 100 watts respectively. In addition, at the end of the vestibule, near Row K, there is what is known as a vomitory light, or light in the vestibule, which is at the end of the runway leading out of the Auditorium. As previously stated, the plaintiff testified that he was going out into the corridor to smoke, 'that he had seen enough of the ball’; and that he was going to smoke preparatory to joining his party or having the lady guests of his party and the ball party leave the Auditorium and go home. Instead of taking the aisle provided for guests in his call-out section, he proceeded towards Canal Street in the place where the platform was unguarded by chain, which according to his testimony, he took cognizance of, and he testified that he walked to the end of the platform; that he thought that he was stepping down nine inches, and that he actually stepped down 18 inches, causing him to fall and to break his hip. He was conscious of the fact that he was at the end of the row, and he was conscious of the fact that he was stepping down to the floor; that he looked to see whether there was a step-off, which he conceived to be about nine inches, and he was mistaken, it was 18 inches.
*918 “He testified that at the time he was leaving- his seat to go to the corridor, that it was rather dark or dim,- and that he did not know whether - the lights under the balcony, which -have .been described, were on or off; to quote him exactly,' he said if they were, he did not notice them.
“He further testified that at the time that he left, here was a spot light on the dance floor, and it was bright, and the aisle was not ‘so bright/ and the inference from his testimony is that at the time that he was leaving the Auditorium, the tableau of the ball was not completed. This testimony is in conflict with the other testimony in the record of the plaintiff’s own witnesses because Mrs. Constant, a witness for the plaintiff, testified that at the time that the plaintiff left his seat, that the tableau was over; ‘that the people were dancing in front of us/ that there was dancing going on. She further testified that she was not brought to Section K until the tableau was over; that she was seated elsewhere, and was brought there to join a party which had come down from Thibodaux. So, the Court must believe that at the time that the plaintiff left his seat, that the tableau of the ball was over.
“The employees of the Auditorium, both superintendent and the electrician, testified that immediately upon the tableau of the ball being over, and particularly on this night, that the lights under the balcony were turned on as well as other lights on the proscenium, which are in the nature of spot lights, and orchestra lights were on; that the chandeliers in the Auditorium were on although they were set for color. The record further shows that an outside electrician, which is customary at Carnival balls, was there to operate the lighting effects for the ball itself. The record further shows that the plaintiff in this case had been to the Auditorium to attend some of the functions quite a few times, and if not two to three times in the Year of 19SS when this accident happened.
“The Court is convinced from the evidence in this case that at the time the plaintiff fell,'the under-balcony lighting system was lit, and the Court is convinced from the evidence in this case, and in the record that the place where the plaintiff fell was well-lit. As a matter of fact, the record shows that above his head, immediately after the accident, according to his own testimony, the under-balcony ceiling light was lit. The Court visited the scene of the accident, and the Court full-well realizes that it is impossible to produce exactly the same situation as prevailed on the night of the ball for the reason that even though the Auditorium darkened, there was no Carnival lighting on the floor of the Auditorium. ■There were not numerous guests in the Auditorium who the Court could take judicial knowledge of the male guests who would have to have on black suits, that is, full-dress or tuxedoes; the Court again realizes that no matter how the Auditorium was darkened, that light did shine, no matter how little, through the double doors to the aisle K. By taking all these factors into consideration, with the testimony in the record as to the wattage of the bulbs and the lights under the balcony, the Court is convinced that where the plaintiff fell was well-lit at the time. * * * ”
Plaintiff ascribed several acts of negligence to the carnival club and to the Municipal Auditorium which, briefly stated, are: The former is charged with not providing ushers, in failing to properly fasten the guard chain at the end of the tier of seats and to have an attendant present to see that the chain remained in place, and in not properly lighting the locus in quo at the time plaintiff fell. The Municipal Auditorium is alleged to have maintained a trap for unwary guests; failed to adequately light the premises; failed to provide a permanent guard rail; failed to post signs warning of the precipitous drop at the end of the seats; and failed to have attendants to warn those present of the dangers of the situation.
The defendants in their answers denied that their respective assureds were in anywise negligent; the National Surety Cor *919 poration also set up several special defenses, and both respondents pleaded in the alternative contributory negligence on the part of plaintiff, the basis of said plea being that the conditions existing at the time of the accident were obvious to plaintiff who failed to take any steps to guard against the consequence of the alleged defects or dangerous conditions if, as a matter of fact, they actually existed.
No good purpose would or could be subserved by discussing the negligence vel non of the carnival club or the auditorium, nor is it necessary to consider or determine whether plaintiff’s capacity was that of an invitee or licensee, and what, if any, particular duty or duties the carnival club and/ or the auditorium might have owed to him on the occasion of his presence at the Omardz Ball. He is charged by both defendants, in the alternative, with having been contributorily negligent, and if it appears from the record that he was guilty of negligence which contributed proximately to the accident, the defendants have made a •successful defense and the case must end there, even if it be assumed that the alleged tort-feasors were guilty of each and every act of negligence charged against them. However, let it be understood that we make no decision on the question of negligence on the part of either the carnival club or the Municipal Auditorium, or both.
When the demands of the plaintiff are based on allegations of negligence and the defendant interposes a denial of the alleged negligence and enters an alternative plea of contributory negligence, in these circumstances courts ofttimes will deem it expedient to first consider the plea of contributory negligence, because if the facts ■show there was negligence on the part of the claimant without which the accident could not have happened, it becomes entirely unnecessary to consider whether the defendant is guilty of primary negligence. Gibbens v. New Orleans Terminal Co., 159 La. 347, 105 So. 367; Brown v. Texas & P. R. Co., 42 La.Ann. 350, 7 So. 682; Al-brecht v. Gaethe, La.App., 97 So.2d 88; Lehon v. New Orleans Public Service Inc., 10 La.App. 715, 123 So. 172; Smith v. Illinois Cent. R. Co., 10 La.App. 342, 120 So. 405; Townsend v. Missouri Pacific R. Co., 6 La.App. 303.
In Woodall v. Southern Scrap Material Co., La.App., 40 So.2d 495, 496, we said:
" * * * it sometimes happens that evidence tending to show contributory negligence seems to stand out predominantly, and in such cases it may be better to consider that evidence first because, if it appears that the true cause of the accident was the negligence or contributory negligence of the person injured or killed, then there can be no recovery regardless of whether there was or was not primary negligence chargeable to the defendant.”
The cause of plaintiff’s fall to the floor from the elevation of the platform appears in his own testimony and stands out in relief. We quote from his direct examination:
“Q. Now, did you — when you got to the end of the row of seats, what did you see? A. Well, I saw the aisle. I stepped down from the platform I was on to the floor of the aisle.
“Q. And I think you testified that you saw that there was a step-off there, is that correct ? A. I thought that there was only about nine inches to step down, but I am sure there were eighteen or twenty inches.
“Q. And you did look to see that there was a step-off which you thought was approximately nine inches? A. Yes, sir.”
The trial judge, in recounting the facts of the case, also states that plaintiff had been looking out over the dance floor into the bright spotlights and that perhaps his eyes were not properly adjusted to the changed conditions when he turned to pro *920 ceed to the end of Row “C,” and we think this observation is pertinent and warranted by plaintiff’s testimony. It is not unreasonable then to say that plaintiff thoughtlessly and carelessly walked along the row of seats to the end of the platform well knowing that there was an inequality in the height as between the platform and the surface of the aisle, and that to reach the aisle he would have to proceed from the higher to the lower level. This is a clear case where the plaintiff misjudged or miscalculated the distance between the two levels, which was 18 inches rather than the 9 inches he believed it to be, and his misjudgment was, at least, a contributing and proximate factor in connection with his fall and ensuing physical injuries. The conditions of which plaintiff complains were not hidden or secret. He admits he was cognizant of the raised platform and had enough light to guide his step, and we can only conclude that had he exercised the caution which could be expected from a reasonable and prudent man under the same circumstances, there would have been no accident. His own negligence stands as an insuperable barrier to a recovery of damages.
Appellant complains of the trial court’s dismissal of his rule for a new trial and contends before us that there was error in such refusal which deprived him of substantial justice. The gravamen of the allegations contained in the application for the new trial is that defendants neglected to produce one of their witnesses, whose name and address plaintiff only learned subsequent to the trial, and that this constitutes newly discovered evidence relevant to the case which would justify a new trial in the matter. It is alleged further in the application that the missing witness, whose name is Tonkel, was an eyewitness to the accident and has a specific recollection that the under balcony ceiling and wall bracket balcony lights were not turned on at the time of the accident.
We can perceive no error in the refusal to grant a new trial and cannot understand how plaintiff may successfully assert that he was deprived of any of his rights or of justice. The granting of or the refusal to grant a new trial is a matter vested within the sound discretion of the trial judge, and his action on the application for a new trial will not be disturbed by the appellate court unless it clearly appears that the judge has abused his discretion. Not only do we not find that there was an abuse of discretion, but, on the contrary, it appears that the trial judge exercised his discretion wisely in refusing the new trial. The only phase of the case about which the missing witness could have testified was how well the auditorium was lighted at the time of plaintiff’s fall, and even supposing that he would go as far as to testify that the auditorium was in complete darkness, plaintiff would be in no stronger position. Nothing that the witness could say would have the effect of expunging from the record or overcoming plaintiff’s own admissions that the auditorium was lighted adequately enough for him to see the step-off he must negotiate, and that he fell because of his misapprehension of the distance to the surface of the aisle.
The judgment appealed from is affirmed.
Affirmed.